## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

ODETTE BLANCO DE FERNANDEZ
*née* BLANCO ROSELL; EMMA RUTH BLANCO,
in her personal capacity, and as Personal
Representative of the ESTATE OF ALFREDO
BLANCO ROSELL, JR; HEBE BLANCO
MIYARES, in her personal capacity, and as Personal
Representative of the ESTATE OF BYRON
BLANCO ROSELL; SERGIO BLANCO DE LA
TORRE, in his personal capacity, and as
Administrator *Ad Litem* of the ESTATE OF
ENRIQUE BLANCO ROSELL; EDUARDO
BLANCO DE LA TORRE, as Administrator *Ad
Litem* of the ESTATE OF FLORENTINO
BLANCO ROSELL; LIANA MARIA BLANCO;
SUSANNAH VALENTINA BLANCO; LYDIA
BLANCO BONAFONTE; JACQUELINE M.
DELGADO; BYRON BLANCO, JR.;
MAGDELENA BLANCO MONTOTO;
FLORENTINO BLANCO DE LA TORRE; JOSEPH
E. BUSHMAN; CARLOS BLANCO DE LA
TORRE; and GUILLERMO BLANCO DE LA
TORRE;

       Plaintiffs,

       v.

MSC MEDITERRANEAN SHIPPING COMPANY
SA;

       Defendant.

_____ /

## **COMPLAINT**

Odette Blanco de Fernandez *née* Blanco Rosell ("Odette Blanco Rosell"); Emma Ruth

Blanco, in her personal capacity, and as Personal Representative of the Estate of Alfredo Blanco

Rosell, Jr; Hebe Blanco Miyares, in her personal capacity, and as Personal Representative of the

Estate of Byron Blanco Rosell; Sergio Blanco de la Torre, in his personal capacity, and as Administrator *Ad Litem* of the Estate of Enrique Blanco Rosell; Eduardo Blanco de la Torre, as Administrator *Ad Litem* of the Estate of Florentino Blanco Rosell; Liana Maria Blanco; Susannah Valentina Blanco; Lydia Blanco Bonafonte; Jacqueline M. Delgado; Byron Diaz Blanco, Jr.; Magdelena Blanco Montoto; Florentino Blanco de la Torre; Joseph E. Bushman; Carlos Blanco de la Torre; and Guillermo Blanco de la Torre ("Plaintiffs"), by and through counsel, as and for their Complaint against MSC Mediterranean Shipping Company SA ("MSC" or "Defendant") hereby allege:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action to recover damages and interest under the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, codified at 22 U.S.C. § 6021, *et seq.* (the "Helms-Burton Act" or "Act") against Defendant for trafficking in property which was confiscated by the Cuban Government on or after January 1, 1959 and as to which Plaintiffs own claims.

2.      On September 29, 1960, the Cuban Government published the announcement of the confiscation without compensation of the following property of Plaintiff Odette Blanco Rosell, who is living, and her siblings, all of whom are deceased:  Alfredo Blanco Rosell, Jr.; Florentino Blanco Rosell; Enrique Blanco Rosell; and Byron Blanco Rosell (collectively, the "Blanco Rosell Siblings")[1]:

> One: To confiscate, on behalf of the Cuban State, all of the property and rights, whatever their nature, forming the assets of the persons listed in the first Whereas, with the exception of property and rights that are strictly of a personal nature.
>
> Two: To confiscate, on behalf of the Cuban State, all shares or stock certificates representing capital of the entities listed in the [other] Whereas of this resolution, along with all of their properties, rights, and shares that are issued and in circulation.

---

[1] As stated above in the caption, the claims of Alfredo Blanco Rosell, Jr.; Florentino Blanco Rosell; Enrique Blanco Rosell; and Byron Blanco Rosell, are being pursued by their Personal Representatives and Administrators *Ad Litems,* respectively.

> Three: To order the transfer of the properties, rights, and shares forming the assets of the legal entities listed in the preceding provision to the National Institute for Agrarian Reform (I.N.R.A.).
>
> Four: This resolution to be published in the OFFICIAL GAZETTE of the Republic for purposes of notification and fulfillment of what is provided for by Law No. 715 of 1960.

Resolution No. 436 published in the Cuban Official Gazette dated September 29, 1960 at 23405 - 23406 (English translation).

3.      The "persons listed in the first Whereas" in Resolution No. 436 above is a reference to the Blanco Rosell Siblings, who had been the subject of "investigations" carried out by the Cuban Government. *See id.* at 23405 (first Whereas clause) ("Whereas: Having considered cases number 3-2-3143, 3-2-8990 and 3-2-9832, regarding the investigations carried out on the following persons:  Alfredo, Enrique, Florentino, Byron, and Odette Blanco Rosell.").

4.      The Blanco Rosell Siblings' property confiscated by the Cuban Government included all of their "property and rights, whatever their nature," including but not limited to:

> (a) their wholly owned company, Maritima Mariel SA, and the 70-Year Concession held by Maritima Mariel SA, to develop docks, warehouses and port facilities on Mariel Bay, a deep water harbor located on the north coast of Cuba; and
>
> (b) their wholly owned companies, Central San Ramón and Compañia Azucarera Mariel S.A., including those companies' extensive land holdings (approximately 11,000 acres) on the southeast, south and west sides of Mariel Bay, which included a number of improvements such as roads, railways, buildings, and utilities

*See* Resolution No. 436 published in the Cuban Official Gazette dated September 29, 1960 at 23406 (English translation) ("Confiscated Property").

5.      The Blanco Rosell Siblings were not U.S. citizens when the Cuban Government confiscated their Confiscated Property in 1960.  They fled Cuba after the confiscation and became U.S. citizens before March 12, 1996, the date the Helms-Burton Act was signed into law.  The Blanco Rosell Siblings were not eligible to, and therefore did not file claims with the Foreign

Claims Settlement Commission under Title V of the International Claims Settlement Act of 1949.

Today, only Plaintiff Odette Blanco de Fernandez, *née* Blanco Rosell, age 91, is alive.

6.      In 1996, the U.S. Congress passed the Helms-Burton Act, and President William J.

Clinton signed the Act into law on March 12, 1996.  Title III of the Act, which took effect in

August 1996, imposes liability against persons who "traffic" in property confiscated by the Cuban

Government on or after January 1, 1959, the claims to which are owned by persons who became

U.S. nationals after the confiscation of their property and before March 12, 1996.

7.      Although Title III's creation of liability as to those engaged in trafficking has

remained in force since August 1996, the ability of any potential plaintiff to bring a private right

of action for Title III violations had been suspended by several Presidents (pursuant to authority

granted in the Act) until May 2019, when President Donald Trump allowed the suspension of Title

III's private right of action to lapse, thereby allowing such actions to proceed.

## PARTIES

### I.      Plaintiffs

8.      Plaintiff Odette Blanco de Fernandez, *née* Blanco Rosell, is a United States national

within the meaning of 22 U.S.C. § 6023(15)(A).  She acquired ownership of her claim to the

Confiscated Property before March 12, 1996, which claim she still owns.  She became a naturalized

U.S. citizen on September 8, 1971.  She resides in Miami-Dade County, Florida.

9.      Alfredo Blanco Rosell's claim to the Confiscated Property is prosecuted by Plaintiff

Emma Ruth Blanco, in her capacity as Personal Representative of Alfredo Blanco Rosell's estate.

The Circuit Court for Miami-Dade County, Florida, Probate Division, has opened Alfredo Blanco

Rosell's estate, appointed Emma Ruth Blanco as Personal Representative, and issued Letters of

Administration for the purpose of Emma Ruth Blanco pursuing Alfredo Blanco Rosell's Helms

Burton Act claim.  *In re Estate of Alfredo, deceased*, Case No. 2020-005105-CP-02, Section PMH03 (J. Soto).  Alfredo Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen on August 26, 1970.  He acquired ownership of his claim to the Confiscated Property before March 12, 1996.   Prior to his death on December 10, 2006, he resided in Miami-Dade County, Florida.

10.     Byron Blanco Rosell's claim to the Confiscated Property is prosecuted by Plaintiff Hebe Blanco Miyares, in her capacity as Personal Representative of Byron Blanco Rosell's estate. The Circuit Court for Miami-Dade County, Florida, Probate Division, has re-opened Byron Blanco Rosell's estate, appointed Hebe Blanco Miyares as Personal Representative, and issued Letters of Administration for the purpose of Hebe Blanco Miyares pursuing Byron Blanco Rosell's Helms Burton Act claim.  *In re Estate of Byron Blanco, deceased*, Case No. 2001-002462-CP-02, Section PMH03 (J. Soto).  Byron Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen in or around 1972.  He acquired ownership of his claim to the Confiscated Property before March 12, 1996.   Prior to his death on February 25, 2001, he resided in Miami-Dade County, Florida.

11.     Enrique Blanco Rosell's claim to the Confiscated Property is prosecuted by Plaintiff Sergio Blanco de la Torre ("Sergio Blanco"), in his capacity as Administrator *Ad Litem* of Enrique Blanco Rosell's estate.  The Circuit Court for Miami-Dade County, Florida, Probate Division, has re-opened Enrique Blanco Rosell's estate and appointed Sergio Blanco as Administrator *Ad Litem* for the purpose of Sergio Blanco pursuing Enrique Blanco Rosell's Helms Burton Act claim.  *In re Estate of Enrique Blanco, deceased*, Case No. 2021-000187-CP-02, Section PMH03 (J. Soto).  Enrique Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen on September 23, 1970.  He

acquired ownership of his claim to the Confiscated Property before March 12, 1996.  Prior to his death on November 27, 2014, his last known place of residence was San Juan, Puerto Rico.

12.     Florentino Blanco Rosell's claim to the Confiscated Property is prosecuted by Plaintiff Eduardo Blanco de la Torre, in his capacity as Administrator *Ad Litem* of Florentino Blanco Rosell's estate.  The Circuit Court for Miami-Dade County, Florida, Probate Division, has re-opened Florentino Blanco Rosell's estate and appointed Eduardo Blanco de la Torre as Administrator *Ad Litem* for the purpose of pursing Florentino Blanco Rosell's Helms-Burton Act claim.  *In re Estate of Florentino Blanco, deceased*, Case No. 2021-000131-CP-02, Section PMH03 (J. Soto).  Florentino Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen in or around 1975.  He acquired ownership of his claim to the Confiscated Property before March 12, 1996.   Prior to his death on March 18, 2005, his last known place of residence was Baldrich, Puerto Rico.

13.     Plaintiff Emma Ruth Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Alfredo Blanco Rosell's daughter.  To the extent that Alfredo Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. She became a naturalized U.S. citizen on January 4, 1973.  She resides in Miami-Dade County, Florida.

14.     Plaintiff Liana Maria Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Alfredo Blanco Rosell's daughter.  To the extent that Alfredo Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. Upon knowledge, information and belief, she became a naturalized U.S. citizen prior to March 12, 1996.  She resides in Miami-Dade County, Florida.

15.     Plaintiff Susannah Valentina Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Alfredo Blanco Rosell's granddaughter.  To the extent that

Alfredo Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. Upon knowledge, information and belief, she became a naturalized U.S. citizen prior to March 12, 1996. She resides in Miami-Dade County, Florida.

16.     Plaintiff Hebe Blanco Miyares is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). She is Byron Blanco Rosell's daughter. To the extent that Byron Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. She became a naturalized U.S. citizen on September 23, 1970. She resides in Miami-Dade County, Florida.

17.     Plaintiff Lydia Blanco Bonafonte is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). She is Byron Blanco Rosell's daughter. To the extent that Byron Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. She became a naturalized U.S. citizen on November 17, 1971. She resides in Miami-Dade County, Florida.

18.     Plaintiff Jacqueline M. Delgado is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). She is Byron Blanco Rosell's daughter. To the extent that Byron Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. She became a naturalized U.S. citizen on February 18, 1970. She resides in Miami-Dade County, Florida.

19.     Plaintiff Byron Blanco, Jr. is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). He is Byron Blanco Rosell's son. To the extent that Byron Blanco Rosell's claim does not remain with his Estate, Byron Blanco, Jr. inherited and owns a portion of that claim. He became a naturalized U.S. citizen before March 12, 1996. He resides in Orange County, California.

20.     Plaintiff Magdelena Blanco Montoto is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Florentino Blanco Rosell's daughter.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim.  She became a naturalized U.S. citizen on June 21, 1977.   She resides in Miami-Dade County, Florida.

21.     Plaintiff Sergio Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son and Enrique Blanco Rosell's nephew.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Sergio Blanco inherited and owns a portion of that claim.  In addition, to the extent Enrique Blanco Rosell's claim does not remain with his Estate, Sergio Blanco inherited and owns all of that claim.  He became a naturalized U.S. citizen on January 25, 1983.  He resides in Guaynabo, Puerto Rico.

22.     Plaintiff Florentino Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Florentino Blanco de la Torre inherited and owns a portion of that claim.  He became a naturalized U.S. citizen on February 1, 1978.  He resides in Gauynabo, Puerto Rico.

23.     Plaintiff Joseph E. Bushman is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is the surviving husband of Florentino Blanco Rosell's daughter, Maria Elena Blanco.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Joseph E. Bushman inherited and owns a portion of that claim.  He was born a U.S. citizen on March 14, 1947 and has remained a U.S. citizen his entire life.  He resides in Sumter County, Florida.

24.     Plaintiff Carlos Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Carlos Blanco de la Torre inherited and owns a portion of that claim.  He became a naturalized U.S. citizen on February 26, 1985.  He resides in Gauynabo, Puerto Rico.

25.     Plaintiff Guillermo Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Guillermo Blanco de la Torre inherited and owns a portion of that claim.  He became a naturalized U.S. citizen on August 3, 1982.  He resides in San Juan, Puerto Rico.

**II.     Defendant**

26.     Defendant MSC Mediterranean Shipping Company, S.A. ("MSC") is a Société Anonyme organized under the laws of Switzerland with its principal place of business located at Chemin Rieu 12-14, 1208 Geneva, Switzerland.

27.     MSC describes itself as a "global business engaged in the shipping and logistics sector. Present in 155 countries, MSC facilitates international trade between the world's major economies, and among emerging markets across all continents."[2]

28.     MSC has more than 100,000 employees and 570 vessels covering 500 ports of call as shown in the figure below.[3]

---

[2] https://www.msc.com/che/about-us (last visited Sept. 15, 2021).

[3] *Id.*



29.     According to its website, MSC operates at 25 ports in the United States.[4]



30.     As discussed more fully below (*infra*, ¶¶ 104-112), MSC has trafficked in the Confiscated Property, the claims to which are owned by Plaintiffs, since at least 2016 through at

---

[4] https://www.msc.com/search-schedules (last visited Sept. 15, 2021). These 25 ports are located in 18 different states.  MSC operates in nearly every single U.S. state that touches the Atlantic Ocean, Pacific Ocean, or Gulf of Mexico.

least July 2021.  According to bills of lading on file with U.S. Customs and Border Protection, since 2016, Defendant has served as the carrier for approximately 273 cargo shipments from various U.S. Ports, including multiple cargo shipments from Port Everglades in Fort Lauderdale (within this Judicial District) to the Port of Mariel,[5] the final destination declared.

31.     The containers that Defendant carries to the Port of Mariel are loaded at U.S. ports, including Port Everglades and Jacksonville, and then Defendant carries the containers to ports in Panama, the Bahamas, and the Dominican Republic where the containers are off-loaded and then loaded onto other ships (a/k/a "commercial feeder" ships) and are then carried by Defendant to the Port of Mariel, the declared final destination where they are off-loaded at Terminal de Contenedores del Mariel ("TCM" or "Container Terminal"), which is part of the Port of Mariel within the Zona Especial de Desarollo Mariel ("ZEDM") (a/k/a Mariel Special Economic Zone) and within the Bay of Mariel.  MSC profits by, from and through carrying the cargo to the Port of Mariel.

32.     As discussed more fully below (*infra* at ¶¶ 113 – 119), MSC also has trafficked in the Confiscated Property, the claims to which are owned by Plaintiffs, because ships owned, operated and/or directed by MSC, or commercial feeder ships contracted by, or otherwise engaged by MSC, have trafficked in the Confiscated Property by "calling" at the Container Terminal which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel, and while calling at

---

[5] As used in this Complaint, the "Port of Mariel" comprises more than 2,300 feet of wharf space, four super Post-Panamax cranes, and the capacity to handle 820,000 cargo containers annually through the Port's Container Terminal which is the single largest user of the ZEDM. *See* Mariel is Cuba's big industrial gamble. Could U.S. companies be among investors? Miami Herald, Oct. 23, 2017.  Exhibit A hereto.  *See also* Port of Mariel New Transport Hub for the Americas, https://www.caribbeanshipping.org/images/CSEC2016/Presentation_TC_Mariel_English_17051 6.pdf (last visited Sept. 15, 2021) Exhibit B hereto (redacted to remove data regarding other Cuban ports).

the Container Terminal, engaged in commercially beneficial transactions and other commercial activities with the Container Terminal, Almacenes Universales S.A. (also known as "AUSA"),[6] and/or the ZEDM.  MSC profits by, from and through the business activities of the ships, some of which are ships from MSC's fleet, and others of which are feeder ships operated by other companies with whom MSC engages in business transactions for the purpose, *inter alia* of transporting the containers that MSC carries on the final leg of the containers' journeys to the Port of Mariel.

33.     "Calling" at a port in the container shipping industry means that containers are either offloaded or loaded at a Port of Call. See https://www.marineinsight.com/life-at-sea/what-does-the-term-port-of-call-means/ (last visited September 15, 2021).  While calling at the Port of Mariel, the vessels dock and utilize wharf space, offload and/or load containers, hook up to water and electricity, utilize crane service, container storage yards, warehouses and other storage space to store the containers, as well as road, rail and wheeled means of conveyance for the containers it unloads.  MSC contracts for and pays for these and other services at the Port of Mariel with the TCM, AUSA, and/or the ZEDM.

34.     As discussed more fully below (*infra* at ¶¶ 120 – 123), Defendant's trafficking includes Defendant trafficking through its Cuban agent, Agencia Maritima Mapor S.A. ("Mapor

---

[6] AUSA is a subsidiary of Grupo de Administración Empresarial SA (or GAESA), an umbrella group controlled by the Cuban military.  In December 2020, the U.S. Treasury Department added GAESA to its "Specially Designated Nationals and Blocked Persons" list, barring American individuals and companies from doing business with the company.  *See* Notice of OFAC Sanctions Action, 85 Fed. Reg. 84468 (Dec. 28, 2020).

Habana").[7]   According to Mapor Habana's Terms And Conditions ("Agency T&Cs"), Mapor Habana acts exclusively as MSC's agent in Cuba (where Mariel is the only port that MSC serves), provides "inland forwarding services" in addition to the voyage, and accepts customer bookings involving Cuba.[8]

35.    Since at least 2016, MSC purposefully and repeatedly carried cargo to the Port of Mariel and directed ships to call at the Container Terminal, which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel, where the ships, for themselves and on behalf of and/or at the direction of Defendant, called at the Container Terminal and while there engaged in commercially beneficial transactions and other commercial activities with the Container Terminal, AUSA, and/or the ZEDM including, but not limited to, offloading and loading containers of cargo carried by Defendant, thereby using or otherwise benefiting from the Confiscated Property without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(ii).

36.    Since at least 2015, Defendant knowingly and intentionally carried cargo to the Port of Mariel and directed ships to call at the Port of Mariel to engage in commercially beneficial transactions and other commercial activities—including, but not limited to, calling at the Container Terminal, which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel, and offloading and loading containers of cargo carried by Defendant at the Container Terminal

---

[7] *See* https://www.msc.com/cub/contact-us?lang=en-gb ("Agencia Maritima Mapor S.A., Edificio Beijing Oficina No. 116, Avenida 3ra entre 76 y 78, Miramar Playa, CU - LA HABANA, CIUDAD DE LA HABANA ***as agent only for MSC Mediterranean Shipping Company S.A.***") (last visited Sept. 15, 2021) (emphasis added).

[8]  Mapor Habana Terms and Conditions (a/k/a "Agency T&Cs") at 3, 15-17 (Exhibit C, hereto); *see also*  https://www.msc.com/global-document-library/msc-cuba/msc-cuba-agency-t-cs  (last visited Sept. 15, 2021).

whereby MSC, caused, directed, participated in, or profited from trafficking by other persons or otherwise engaged in trafficking through other persons without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

**III.   Relevant Non-Parties**

37.   The Terminal de Contenedores del Mariel ("TCM" or "Container Terminal") is a 100% Cuban state-owned entity.  TCM displays MSC as one of its "nuestros clients" on TCM's main website's landing page, available at https://www.tcmariel.cu/ (last visited September 21, 2021).



38.   Non-party Almacenes Universales S.A. (also known as "AUSA") is a 100% Cuban state-owned entity that is a comprehensive logistics operator that, *inter alia,* runs the container storage yard in the ZEDM.  AUSA is a subsidiary of Grupo de Administración Empresarial SA (or GAESA), an umbrella group controlled by the Cuban military.  On November 9, 2017, the U.S. State Department listed GAESA, AUSA, and the TCM as Restricted Entities and Subentities Associated with Cuba.  *See* The State Department's List of Entities and Subentities Associated with Cuba (Cuba Restricted List), 82 Fed. Reg. 52089 (Nov. 9, 2017).

39.   In December 2020, the U.S. Treasury Department added GAESA to its "Specially Designated Nationals and Blocked Persons" list, barring American individuals and companies from doing business with the company.  *See* Notice of OFAC Sanctions Action, 85 Fed. Reg. 84468 (Dec. 28, 2020).

40.     The TCM and AUSA container storage yard are physically located in the Port of Mariel.  As described more fully herein (*see infra* ¶¶ 94 – 97), the ZEDM is a special economic zone created by Cuban statute.  The TCM and AUSA are physically located in the Port of Mariel which is within and part of the ZEDM.   TCM, AUSA and ZEDM are all agencies or instrumentalities of the Republic of Cuba as defined in 28 U.S.C. § 1603(b).

41.     TCM, AUSA and the ZEDM, while aware that the Confiscated Property had been confiscated from the Blanco Rosell family, knowingly and intentionally traffic in the Confiscated Property because they each individually and collectively, "transfer[], distribute[], dispense[], broker[], manage[] … lease[], receive[], possess[], obtain[] control of, manage[], use[], or otherwise acquire[] or hold[] an interest in" the Confiscated Property. See 22 U.S.C. § 6023(13)(A)(i). In plain terms, the TCM, AUSA and/or the ZEDM manage the land, concessionaires and users of the ZEDM and contract with companies, including MSC, that do business in the ZEDM and with the TCM and AUSA–for example by offloading and/or loading containers from MSC ships at the TCM and parking/storing them at the container storage yard operated by AUSA.

42.     TCM, AUSA and the ZEDM also engage in commercial transactions and commercial activities in which they use and benefit from the land that was confiscated from the Blanco Rosell Siblings that underlies the ZEDM and from the 70-year Concession rights to execute, maintain, and exploit the docks, wharves, warehouses and storage areas in the Port of Mariel which is within the Bay of Mariel.

43.     Agencia Maritima Mapor S.A. ("Mapor Habana") is MSC's Cuban agent and is located at Edificio Beijing Oficina No. 116, Avenida 3ra entre 76 y 68, Miramar Playa, Ciudad de la Habana, Cuba.

44.     Double Ace Cargo, Inc. ("Double Ace"), a company organized under the laws of Florida, with its principal place of business at 2175 NW 115th Ave., Miami, Florida, 33172, is primarily engaged in furnishing shipping information and acting as agents in arranging transportation for freight and cargo.  Double Ace is listed as the "Exporter" on 202 of the 204 Bills of Lading on which MSC was the carrier for cargo shipments from U.S. Ports to the Container Terminal at the Port of Mariel.

45.     Apacargoexpress Company, upon information and belief, a company organized under the laws of Florida, with its principal place of business at 1335 NW 98 Court Suite 5 & 6, Miami, Florida, 33172, is listed at the "Exporter" on 23 of the 204 Bills of Lading on which MSC was the carrier for cargo shipments from U.S. Ports to the Container Terminal at the Port of Mariel.

## JURISDICTION AND VENUE

46.     Defendant is subject to the personal jurisdiction of this Court pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and pursuant to Fla. Stat. § 48.193 including §§ 48.193(1)(a)1, 48.193(1)(a)2,  48.193 (1)(a)6, and 48.193(2) thereof, because, *inter alia,* (a) Defendant is engaged in substantial and not isolated activity within this State; (b) Defendant committed and continues to commit acts of trafficking as defined in the Helms Burton Act, 22 U.S.C. § 6023(13) within the state of Florida and within this judicial District and thus is subject to personal jurisdiction in the state courts of Florida and in this Court; (c) Defendant, personally or through its agents, is operating, conducting, engaging in, or carrying on a business or business venture in Florida, including the business of carrying containers from Florida to the Port of Mariel (*see infra* ¶¶ 104 – 112); and/or (d) Defendant is causing injury to persons who reside in this state arising out of acts or omissions by Defendant and/or its agents outside this State while Defendant and/or its agents were engaged in the solicitation of service activities within this State.

47.     In the alternative, to the extent Defendant is not subject to jurisdiction in any state, personal jurisdiction is conferred upon this Court over Defendant by Federal Rule of Civil Procedure 4(k)(2), because Plaintiffs' Helms-Burton Act claim arises under federal law; Defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and exercising jurisdiction over Defendant based on its nationwide contacts is consistent with the U.S. Constitution and laws because Defendant has systematic and continuous contacts with the United States, it has purposefully availed itself of the benefits and protections of the United States, and this action arises from or relates to such contacts and purposeful availment. *See* ¶¶ 29, 104 – 112.

48.     In addition, in the alternative to personal jurisdiction alleged above, to the extent Defendant is not subject to jurisdiction in any state, personal jurisdiction is conferred upon this Court over Defendant by Federal Rule of Civil Procedure 4(k)(2), because Plaintiffs' Helms-Burton Act claim arises under federal law; Defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and exercising jurisdiction over the Defendant for its conduct purposefully directed at the United States is consistent with the U.S. Constitution and laws. The exercise of personal jurisdiction by this Court over Defendant is consistent with the U.S. Constitution and U.S. laws because Defendant committed intentional torts purposefully directed at U.S. nationals in the United States which caused harm that Defendant knew or reasonably should have anticipated would be suffered in the United States by certain U.S. nationals.

49.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States, specifically Title III of the Helms-Burton Act, 22 U.S.C. §§ 6081–85.

50.     The amount in controversy in this action exceeds $50,000, exclusive of interest, treble damages, court costs, and reasonable attorneys' fees.  22 U.S.C. § 6082(b). Venue is proper

in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claim occurred in this District.

51.     Contemporaneous with this filing, Plaintiffs have paid the special fee for filing an action under Title III of the Helms-Burton Act, 22 U.S.C. § 6082(i).

## THE HELMS-BURTON ACT

### I.     Background

52.     The Helms-Burton Act, signed into law on March 12, 1996, has several goals, including to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." 22 U.S.C. § 6022(6).  Further, Congress determined that "'trafficking' in confiscated property provides badly needed financial benefit, including hard currency, oil, and productive investment and expertise to the … Cuban Government and thus undermines the foreign policy of the United States," which foreign policy includes "protect[ing] claims of United States nationals who had property wrongfully confiscated by the Cuban Government." 22 U.S.C. § 6081(6).

53.     Congress found that international law "lacks fully effective remedies" for the "unjust enrichment from the use of wrongfully confiscated property by governments and private entities at the expense of the rightful owners of the property." 22 U.S.C. § 6081(8).

54.     Congress thus decided that "the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." 22 U.S.C. § 6081(11).  The result was Title III of the Helms-Burton Act – "Protection of Property Rights of United States Nationals" – which imposes liability on persons trafficking in property confiscated from a U.S. national (including property confiscated from a person who became a U.S. national before March 12, 1996)

by the Cuban Government on or after January 1, 1959, and which authorizes a private right of action for damages against such traffickers.  *See* 22 U.S.C. § 6082.

55.     The Helms-Burton Act authorizes the President (or his delegate, the Secretary of State) to suspend for periods of up to six months at a time (1) the Title III private right of action, 22 U.S.C. § 6085(c); and/or (2) the effective date of Title III of August 1, 1996, 22 U.S.C. § 6085(b).

56.     On July 16, 1996, President Clinton announced that after the Helms-Burton Act came into effect on August 1, 1996, he was suspending the private right of action under Title III for six months.  The August 1, 1996 effective date was never suspended. Starting on that date, traffickers in confiscated property were liable to U.S. nationals with claims to that property but could not be sued while the private right of action remained suspended.

57.     President Clinton and subsequent administrations renewed the suspension of the Title III private right of action, typically for six months at a time, by decision of the President or the Secretary of State.  There was never any guarantee that additional suspensions of the private right of action would be granted indefinitely into the future, and the operative provisions of the Act have remained in effect continuously since 1996.

58.     On April 17, 2019, Secretary of State Pompeo announced that the Trump Administration would no longer suspend the right to bring an action under Title III, effective May 2, 2019.  On May 2, 2019, upon the expiration of the last suspension, the right to bring an action under Title III was activated.

**II.     The Helms-Burton Act's Private Right of Action**

59.     Title III of the Helms-Burton Act provides the following private right of action:

(1) Liability for trafficking. — (A) Except as otherwise provided in this section, any person that, after the end of the 3-month period  beginning on the effective date

19

of this title, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages...

22 U.S.C. § 6082(a)(1).

60.     The Act defines "person" as "any person or entity, including any agency or instrumentality of a foreign state." 22 U.S.C. § 6023(11).

61.     The Act defines "United States national" to include "any United States citizen or any other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States."  22 U.S.C. § 6023(15).

62.     The Act adopts the definition of "agency or instrumentality of a foreign state" under 28 U.S.C. § 1603(b), *see* 22 U.S.C. § 6023(1) ("Agency or Instrumentality of a Foreign State.— The term "agency or instrumentality of a foreign state" has the meaning given that term in section 1603(b) of title 28, United States Code.").

63.     A person "traffics" in confiscated property if that person "knowingly and intentionally":

(i)     sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

(ii)    engages in a commercial activity using or otherwise benefiting from confiscated property, or

(iii)   causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person, without the authorization of any United States national who holds a claim to the property

without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13).

64.     The Act defines "property" as "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest." 22 U.S.C. § 6023(12).

65.     The Act defines "confiscated" in relevant part as:

> [T]he nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959 —
>
> (i)      without the property having been returned or adequate and effective compensation provided; or
>
> (ii)     without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure.

22 U.S.C. § 6023(4)(A).

66.     The term "knowingly" under the Act means "with knowledge or having reason to know."  22 U.S.C. § 6023(9).

67.     The Helms-Burton Act adopts the definition of "commercial activity" under 28 U.S.C. § 1603(d), *see* 22 U.S.C. § 6023(3), which defines the term as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).

68.     Under the Act,

(A) The term "Cuban Government" includes the government of any political subdivision of Cuba, and any agency or instrumentality of the Government of Cuba.

(B)  For purposes of subparagraph (A), the term "agency or instrumentality of the Government of Cuba" means an agency or instrumentality of a foreign state as defined in section 1603(b) of title 28, United States Code, with each reference in such section to "a foreign State" deemed to be a reference to "Cuba."

22 U.S.C. § 6023(5).

69.     Since August 1, 1996, when Title III of the Helms-Burton Act went into effect, it has been clear that companies doing business with Cuba or in Cuba incurred potential liability under the Helms-Burton Act if they knowingly and intentionally traffic in confiscated property.

70.     Companies doing business in and/or with Cuba have therefore been on notice since August 1, 1996 that they would face potential liability under the Helms-Burton Act for trafficking in confiscated property.

**III.    Remedies Under the Helms-Burton Act's Private Right of Action**

71.     A person who "traffics" in a U.S. national's confiscated property under the Helms-Burton Act is liable to a plaintiff for money damages equal to:

(i)     the amount which is the greater of —
                              …
        (II) the amount determined [by a court-appointed special master], plus interest; or

        (III) the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater[.]

22 U.S.C. § 6082(a)(1)(A)(i).

72.     Pre-filing interest under the Act accrues from "the date of confiscation of the property involved to the date on which the action is brought."  22 U.S.C. § 6082(a)(1)(B).  Interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System" for the calendar week

preceding the date of confiscation and compounded annually. 28 U.S.C. § 1961(a) (incorporated by reference in 22 U.S.C. § 6082(a)(1)(B)).

73.    A person who "traffics" in a U.S. national's confiscated property under the Act is also liable for plaintiffs' court costs and reasonable attorneys' fees.   *See* 22 U.S.C. § 6082(a)(1)(A)(ii).

74.    The Act provides for "Increased Liability"

… If the claimant in an action under this subsection… provides, after the end of the 3-month period described in paragraph (1) notice to —

(i)    a person against whom the action is to be initiated, or

(ii)    a person who is to be joined as a defendant in the action,

at least 30 days before initiating the action or joining such person as a defendant, as the case may be, and that person, after the end of the 30-day period beginning on the date the notice is provided, traffics in the confiscated property that is the subject of the action, then that person shall be liable to that claimant for damages computed in accordance with subparagraph (C).

*See* 22 U.S.C. §§ 6082(a)(3)(B) and 22 U.S.C. 6082(a)(3)(C)(ii) (allowing damages "3 times the amount determined applicable under paragraph (1)(A)(i)").

## FACTUAL ALLEGATIONS

### I.    The Confiscated Property

75.    Plaintiffs are U.S. nationals and/or representatives of the Estates of U.S. nationals as defined by 22 U.S.C. § 6023(15)(A), who own claims to the Confiscated Property, which includes a 70-year Concession to develop docks, warehouses and port facilities on Mariel Bay and land holdings.

### A.    Maritima Mariel SA and the 70-Year Concession

76.    Maritima Mariel SA ("Maritima Mariel") was a Cuban corporation set up in 1954 and owned in equal parts by the Blanco Rosell Siblings, who are among the Plaintiffs in this case:

Odette Blanco Rosell; Alfredo Blanco Rosell, Jr as represented by Plaintiff Emma Ruth Blanco, in her capacity as Personal Representative of Alfredo Blanco Rosell's estate; Byron Blanco Rosell as represented by Plaintiff Hebe Blanco Miyares in her capacity as Personal Representative of Byron Blanco Rosell's estate; Enrique Blanco Rosell as represented by Plaintiff Sergio Blanco, in his capacity as Administrator *Ad Litem* of Enrique Blanco Rosell's estate; and Florentino Blanco Rosell as represented by Plaintiff Eduardo Blanco de la Torre, in his capacity as Administrator *Ad Litem* of Florentino Blanco Rosell's estate.

77.     On August 15, 1955, the Cuban Government granted to Maritima Mariel a 70-year Concession:

> 'Maritima Mariel, SA' is hereby granted the concession to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel Bay, province of Pinar del Rio Province, and the construction of new buildings and works, without prejudice to the rights acquired by third persons or entities under previous concessions still in force, for the purposes stated in this paragraph.

Decree 2367 published in the Cuban Official Gazette dated August 15, 1955 at 13864 (English translation).   When the 70-Year Concession was granted to Maritima Mariel, there were no previous concessions in force for the purposes stated in the foregoing quoted paragraph.

78.     The 70-Year Concession also authorized Maritima Mariel to exercise a series of exceptional rights in the Bay of Mariel, including:

a)   The occupation and use, either temporary or permanent, of the lands and waters in the public domain or under private ownership and those of the State, province, or municipality, whenever they are essential for the execution and exploitation of the aforementioned projects and works.

b)   The right of mandatory expropriation, in accordance with Decree No. 595 of May 22, 1907 or any other later provision regarding ownership, possession, or use of any real estate or private property rights for land that must be occupied for the work, uses, and services mentioned in Section One, a procedure that may also be used with regard to any rights granted by the State, province, or municipality with regard to the maritime-land zone or public domain land or property of those entities of the Nation.

c) The right to impose, on privately owned property, any class of easement for the construction of any type of roads, traffic, access, movement, and parking of vehicles, the establishment of power lines (either overhead or underground), pipes and ducts for water, gas, ventilation, or drainage, and, in general, for anything that is inherent or deemed to be necessary for the purposes of carrying out, maintaining, and exploiting the works that the aforementioned paragraph one deals with, also with the power to attend those cases of forced expropriation, as provided for in the preceding subparagraph.

d) The right to evict any tenants, sharecropper, squatter, or occupant of any other description from any property or facilities that must be occupied, either temporarily or permanently, for the projects referred to repeatedly in Section One, making a payment as compensation to the parties evicted equal to the amount of one year of rent paid in each case.

e) The right to carry out the aforementioned acts by means of applying the provisions contained in Law-Decree No. 1015 of August 7, 1953 and No. 1998 of January 27, 1955, whereby the National Finance Agency of Cuba will provide the financing of those projects.

*Id.* at 13865-13866 (English translation).

79.     These exceptional rights granted in the 70-year Concession gave Maritima Mariel and the Blanco-Rosell Siblings priority rights over any other rights in the Bay of Mariel, including any such rights acquired by third persons or entities under previous concessions still in force at the time the 70-year Concession was granted to Maritima Mariel. The 70-Year Concession granted Maritima Mariel the right to exclude any other person or entity from planning, studying, executing, maintaining or exploiting public docks and warehouses in the Bay of Mariel.

80.     Both Maritima Mariel and the 70-Year Concession are part of the Confiscated Property and were specifically identified in Resolution 436 as being confiscated from the Blanco Rosell Siblings by the Cuban Government.

### B.   Central San Ramón, Compañia Azucarera Mariel S.A., and Land

81.     In addition to the 70-Year Concession and Maritima Mariel, the Blanco Rosell Siblings owned several other companies, including the sugar mill then known as the Central San Ramón, which they purchased in 1949.  Central San Ramón was owned and operated by Compañia Azucarera Mariel S.A. ("Azucarera Mariel"), a company wholly owned by the Blanco Rosell Siblings.

82.     The Blanco Rosell Siblings also had extensive land holdings (approximately 11,000 acres) southeast, south and west of Mariel Bay which they owned through Central San Ramón and Azucarera Mariel.  Those approximately 11,000 acres included numerous improvements such as roads, railways, buildings, and utilities.

83.     Azucarera Mariel, Central San Ramón and the 11,000 acres of land are part of the Confiscated Property that were specifically named and confiscated from the Blanco Rosell Siblings by the Cuban Government, in Resolution 436.

### II.   Cuba's Confiscation of The Confiscated Property and Plaintiffs' Claims to The Confiscated Property are Publicly Known

### A.   Cuba's Confiscation of The Confiscated Property was Publicly Announced in the Cuba Official Gazette on September 29, 1960

84.     On September 29, 1960, per Resolution 436, the Cuban Government announced the confiscation without compensation of all assets and rights, whatever their nature, then owned by the Blanco Rosell Siblings and which are herein defined as the Confiscated Property.  Such Confiscated Property includes, *inter alia*, Maritima Mariel, the 70-year Concession, Central San Ramón, Azucarera Mariel, as well as all the "all shares or stock certificates representing capital of the entities listed in the [other] Whereas of [Resolution 436]," which included, *inter alia*, the 70-Year Concession and all the lands owned by these entities.  *See* Resolution 436 at 23406.

85.     More specifically, on September 29, 1960, the Cuban Government published

Resolution 436 in its Official Gazette on the confiscation without compensation of the following:

> One: To confiscate, on behalf of the Cuban State, all of the property and rights, whatever their nature, forming the assets of the persons listed in the first Whereas, with the exception of property and rights that are strictly of a personal nature.
>
> Two: To confiscate, on behalf of the Cuban State, all shares or stock certificates representing capital of the entities listed in the [other] Whereas of this resolution, along with all of their properties, rights, and shares that are issued and in circulation.
>
> Three: To order the transfer of the properties, rights, and shares forming the assets of the legal entities listed in the preceding provision to the National Institute for Agrarian Reform (I.N.R.A.).
>
> Four: This resolution to be published in the OFFICIAL GAZETTE of the Republic for purposes of notification and fulfillment of what is provided for by Law No. 715 of 1960.

Resolution No. 436(1) published in the Cuban Official Gazette dated September 29, 1960 at 23406

(English translation).

86.     In addition to expressly naming the 70-Year Concession and the above-referenced

legal entities, Resolution 436 also expressly named the five Blanco Rosell Siblings as owners of,

*inter alia*, the 70-Year Concession, Maritima Mariel, Central San Ramon, and Compania

Azucarera Mariel.

87.     But for Cuba's confiscation in Resolution 436 published in the official Cuban

Gazette on September 29, 1960, the 70-year Concession granted in Decree 2367 issued in 1955

would still be in force.  In any event, the 70-year Concession was cut short by Cuba's confiscation

of the 70-year Concession.

88.     According to the Cuban Official Gazette as published on September 29, 1960, the

confiscation of the Confiscated Property occurred on August 19, 1960. The story of the

confiscation by the Cuban Government was reported by the Revolucion newspaper on

September 8, 1960.  Both the Cuban Official Gazette and the newspaper Revolucion (now known as Granma following the merger of the Revolucion and Hoy newspapers) are available to the public.

> **B.      Plaintiffs' Claims to the Confiscated Property have Received Wide-Spread Media Coverage since 2019**

89.      The fact of the confiscation of the Blanco Rosell Siblings' property in Cuba was so well known that, on April 18, 2019, the day after the Trump Administration announced that it would allow Helms-Burton Act lawsuits under Title III to go forward, stories published on both Radio Marti and TV Marti identified Plaintiffs' claims to the Mariel Special Development Zone:

> The Mariel Special Development Zone, the star Cuban project to attract investment, was built on nationalized land where the Carranza-Bernal, Carbonell-González and Blanco-Rosell families owned sugar and hemp processing plants.[9]

90.      Since December 20, 2020, Plaintiffs have sued two major U.S. container cargo shipping companies and the world's largest container cargo shipping company for trafficking in the Confiscated Property, the claims to which are owned by Plaintiffs.[10]

91.      Plaintiffs' lawsuits and Plaintiffs' claims to the Confiscated Property have received U.S. and international news coverage, including shipping company media news coverage, for example:

---

[9]      https://www.radiotelevisionmarti.com/a/propiedades-que-ya-podr%C3%ADan-reclamar-en-tribunales-de-eeuu/236777.html/ (last visited Sept. 15, 2021).

[10] *Odette Blanco de Fernandez, et al., v. Seaboard Marine, Ltd.*, Case 1:20-cv-25176-BB (S.D. Fla., Dec. 20, 2020); *Odette Blanco de Fernandez v. Crowley Maritime Corporation*, Case 3:20-cv-01426-BJD-PDB (M.D. Fla., Dec. 20, 2020); *Odette Blanco de Fernandez, et al., v. Crowley Maritime Corporation et al.,* Case 1:21-cv-20443 (S.D. Fla., Feb. 2, 2021); *Odette Blanco de Fernandez, et al. v. A.P. Moller-Maersk A/S et al.*, Case 2:21-cv-00339 (E.D. La., Feb. 17, 2021).

a.    On December 24, 2020, World News Today published a detailed story about Plaintiffs' first two lawsuits, wherein Plaintiffs' claims were discussed in detail.[11]

b.    On December 25, 2020, On Cuba News published a story titled "Two other lawsuits under Helms-Burton Act set sights on Port of Mariel."[12]

c.    On February 24, 2021, TradeWinds, the self-described "Global Shipping News Source" ran an article titled "US-Cuba lawsuits show no signs of slowing down as Maersk sued."[13]

d.    The U.S. - Cuba Trade and Economic Council, Inc. publishes a widely-disseminated blog which reports each and every Helms-Burton lawsuit filing including Plaintiffs' pending lawsuits.[14]

---

[11] https://www.world-today-news.com/florida-companies-sued-for-doing-business-on-land-confiscated-by-cuban-regime/ (last visited Sept. 15, 2021).

[12] https://oncubanews.com/en/cuba-usa/two-other-lawsuits-under-helms-burton-act-set-sights-on-port-of-mariel/ (last visited Sept. 15, 2021).

[13] https://www.tradewindsnews.com/law/us-cuba-lawsuits-show-no-signs-of-slowing-down-as-maersk-sued/2-1-967900 (last visited Sept. 15, 2021).

[14]    https://www.cubatrade.org/blog/2020/12/23/agdh6liz2sexx0emhpw0nrqaphmbnr    Seaboard Marine Is 31st Libertad Act Lawsuit- Plaintiff Targets Mariel Special Economic Zone Operations (last visited Sept. 15, 2021).

https://www.cubatrade.org/blog/2020/12/23/5ms3f5lr8xytqozz63dfr176qxose9    (Crowley Maritime Corporation Is 32nd Libertad Act Lawsuit- Plaintiffs Target Use Of ZEDM Port) (last visited Sept. 15, 2021).

https://www.cubatrade.org/blog/2021/2/18/maersk-worlds-largest-container-shipping-company-is-third-to-be-defendant-in-libertad-act-lawsuit (last visited Sept. 15, 2021).

https://www.cubatrade.org/blog/2021/8/3/pxqrf52mzej1tpilhzxgt1p7my4ajt    European    Union Member France's CMA CGM S.A. Is 41st Company Sued Using Libertad Act- Shipping To Cuba Through Jamaica And Using Port Mariel (last visited Sept. 15, 2021).

92.     The Confiscated Property has never been returned nor has adequate and effective compensation ever been provided, including for the 70-Year Concession or any other property interests belonging to Plaintiffs.  Nor have the claims to the Confiscated Property been settled pursuant to an international claims settlement agreement or other settlement procedure.

93.     Plaintiffs never abandoned their claims to the Confiscated Property.

**III.    The Cuban Government Incorporated the Confiscated Property into The Zona   Especial de Desarrollo Mariel ("ZEDM") (a/k/a Mariel Special Economic Zone)**

94.     The Zona Especial de Desarrollo Mariel ("ZEDM") (*a/k/a* Mariel Special Economic Zone) is an agency or instrumentality of the Cuban Government.   Created by statute, the ZEDM is a special economic zone in Cuba with its own legal structure.

95.     As stated above, the ZEDM has been referred to in the media as "the star Cuban project to attract investment."

96.     Cuba incorporated the Confiscated Property into the ZEDM without the authorization of Plaintiffs and therefore the ZEDM traffics in the Confiscated Property.

97.     Starting in or around 2009, the Government of Cuba and various non-Cuban corporate partners rebuilt the Port of Mariel and constructed a Container Terminal in the ZEDM.

98.     The ZEDM's Container Terminal subsumes the 70-Year Concession rights, pursuant to which the Blanco Rosell Siblings possessed the right, among other things, "to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel, province of Pinar del Rio, and the construction of new buildings and works…." *See* Decree 2367 at 13865.

99.     The Blanco Rosell Siblings' extensive land holdings on the southeast, south and west sides of Mariel Bay, all of which are part of the Confiscated Property, cover virtually every

square meter of ZEDM sector A5, which the ZEDM operates as a logistics zone, as well as portions of section A7 where the ZEDM's Container Terminal is located.

100.   The 70-Year Concession encompasses all of Mariel Bay, including, but not limited to ZEDM Sector A5, where AUSA's container storage yard is located and Sector A7, where the ZEDM's Container Terminal is located.

101.   The following map illustrates that ZEDM Sector A7 encompasses the shoreline of Mariel Bay and land adjacent to the shoreline, areas that are subject to the 70-Year Concession:



102.   The ZEDM, Container Terminal, and AUSA are trafficking in the Blanco Rosell Siblings' Confiscated Property within the meaning of Title III because the ZEDM:

(i)     … transfers, distributes, dispenses, brokers, manages, or … leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in [the Confiscated Property];

(ii)    engages in a commercial activity using or otherwise benefitting from [the Confiscated Property],

      (iii)    causes, directs, participates in, or profits from trafficking (as described clause (i) or (ii) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii) through another person

without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13)(A).

103.    Those who "plan, study, execute, maintain and exploit public docks and warehouses in Mariel Bay, Pinar del Rio Province, and the construction of new buildings and works" (Decree 2367 at 13865) are trafficking in Plaintiffs' Confiscated Property, including the 70-Year Concession.

## IV.    Defendant is Trafficking in the Confiscated Property Without Plaintiffs' Authorization

### A.    Defendant Traffics in the Confiscated Property by Carrying Cargo to the Port of Mariel Without Plaintiffs' Authorization

104.    MSC is listed as the carrier on 273 bills of lading for shipments from the U.S. to the Port of Mariel since 2016.

105.    MSC is actively involved in each stage of these shipments from the U.S. to the Port of Mariel, and profits from them, even as these goods often are transferred from an MSC vessel to a ship operated by a different company at intermediatory points in the Caribbean en route to their final destination of discharge at the TCM at the Port of Mariel in the ZEDM in the Bay of Mariel.

106.    MSC's website lists ports of "transshipment" for every Mariel bill of lading on which it is named as the carrier.

107.    Charles Baker, the general director of the Port of Mariel's container terminal, confirmed in September 2016 that MSC was one of the top international carriers to conduct business at the Port of Mariel:

> [Cuban state-owned carrier] Melfi is the main customer. It has about 30 percent of the business. Then following them, roughly in order, would be Maersk Line, Mediterranean Shipping Co., CMA CGM, Hamburg Sud, Cosco Container Lines — and now China Shipping after the merger — and then Hapag-Lloyd, ZIM Integrated Shipping Services, Evergreen Line, Nirint, and Crowley …[.][15]

108.    MSC's online data also states that some of its bills of lading for carrying cargo to the Port of Mariel were issued by the company's Cuban agent Agencia Maritima Mapor S.A. ("Mapor Habana").

109.    Defendant describes Mapor Habana as "agents for MSC in Cuba" (where Mariel is the only port that MSC serves), and Mapor Habana's Terms and Conditions document indicates that it accepts customer bookings involving Cuba.  Exhibit C at 15-16.  Mapor Habana's Cuban operations also include "inland forwarding services in addition to the voyage." *Id.* at 17.

110.    Bills of lading document multiple instances of MSC acting as carrier for cargo shipments from Port Everglades in Fort Lauderdale and the Port of Jacksonville to the Port of Mariel as the final destination, including as some examples:

(a)    Carrying wine cargo loaded at the Port of Jacksonville and then carried to the Port of Mariel. Each of these deliveries was routed through Freeport, Grand Bahama and Cristobal, Panama as points of transshipment. An April 18, 2018 shipment of 1084 cases of wine was loaded at the Port of Jacksonville and then carried to Freeport on the vessel JSP AMIHAN.  This bill of lading is linked to a Touax Group 20-foot dry van

---

[15]https://webcache.googleusercontent.com/search?q=cache%3Ahttps%3A%2F%2Fwww.joc.com%2Fport-news%2Fterminal-operators%2Fpsa-international%2Fmariel-port-head-outlines-cuba-long-term-shipping-prospects_20160905.html&rlz=1C5CHFA_enUS779US779&oq=cache%3Ahttps%3A%2F%2Fwww.joc.com%2Fport-news%2Fterminal-operators%2Fpsa-international%2Fmariel-port-head-outlines-cuba-long-term-shipping- (last visited Sept. 15, 2021).

container that was unloaded from the vessel VEGA ZETA in the Port of Mariel on May 15, 2018.

(b)     MSC was the carrier for a September 23, 2019 shipment of "household goods/gift parcels" loaded at Port Everglades that was ultimately unloaded in the Port of Mariel on October 17, 2019.  The container was then picked up by the recipient on October 30, 2019 and returned to the Port of Mariel empty on November 8, 2019.

(c)     MSC was the carrier for a February 2, 2017 shipment of 180 packages loaded onto the vessel AGGELIKI P at Port Everglades and then carried to Caucedo, Dominican Republic. The shipped goods included "electrical equipment, appliances, building material/hardware, electrical material, clothing…department store merchandise, electric moped, restaurant supplies, stove, furniture, refrigerators, [and] personal effects." The MSC website links the bill of lading to a 40-foot "high cube" container that was unloaded off the MSC NADRIELY in the Port of Mariel on February 20, 2017 (the vessel departed Cristobal on February 11, 2017 and apparently routed the shipment through Caucedo again during a stop between February 14 and 16, 2017).  The container was picked up by the recipient in the Port of Mariel on February 24, 2017.

(d)     MSC was the carrier for three April 9, 2018 shipments of (a) 274 packages of "gifts and parcels," (b) 360 packages of "gifts and parcels" and (c) 234 packages of "household goods" loaded at Port Everglades and then carried to Caucedo on the vessel MSC MARTA. The MSC website links the bills of lading to three Dong Fang 40-foot "high cube containers that were unloaded from the VEGA ZETA in Mariel on May 15, 2018. MSC reported that the container was picked up by the recipient on May 19, 2018 and

returned empty by June 27, 2018.  MSC's website also states that Mapor Habana issued all three bills of lading.

(e)     MSC was the carrier for a February 11, 2020 shipment of 183 packages of "household goods electrodomestic effects, lingerie, furniture, [and] other articles" loaded at Port Everglades and then carried to Caucedo on the vessel MONACO.  The MSC website links the bill of lading to a Seaco 40-foot "high cube" container that was unloaded in Caucedo on February 13, 2020 and loaded onto the MSC RANIA on February 14, 2020. MSC reported that the container was unloaded in Cristobal on February 16, 2020 and loaded onto the MACAO STRAIT at the nearby Manzanillo port on February 25, 2020. The container was unloaded in the Port of Mariel on March 4, 2020, picked up by the recipient on March 7, 2020 and returned empty to the Port of Mariel by March 11, 2020.

(f)     MSC was the carrier for a March 4, 2021 shipment of 220 packages of "household goods, electrodomestic effects, lingerie, furniture, [and] other articles" loaded at Port Everglades and then carried to Caucedo on the vessel OREGON TRADER. The MSC website links the bill of lading to a Dong Fang 40-foot "high cube" container that was unloaded in Caucedo, Dominican Republic on March 6, 2021 and loaded onto the MSC BIANCA on April 9, 2021.  MSC reported that the container was unloaded in Colon, Panama on April 13, 2021 and loaded onto the CARIBBEAN EXPRESS at the nearby Manzanillo port on May 7, 2021. The CARIBBEAN EXPRESS delivered the container to the Container Terminal at the Port of Mariel on May 14, 2021.  The recipient picked up the container on June 10, 2021 and returned to the container yard at the Port of Mariel on June 28, 2021.

(g)      MSC was the carrier for an April 2, 2021 shipment of 3685 packages of "gifts and parcel" that were loaded at Port Everglades and then carried to Caucedo, Dominican Republic on the vessel OREGON TRADER. The MSC website links the bill of lading to a Dong Fang 40-foot "high cube" container that was unloaded in Caucedo, Dominican Republic on April 5, 2021 and loaded onto the MSC CHLOE on April 23, 2021. MSC reported that the container was unloaded in Cristobal, Panama on April 25, 2021 and loaded onto the CARIBBEAN EXPRESS at the nearby Manzanillo port on May 7, 2021. The CARIBBEAN EXPRESS delivered the container to the Container Terminal at the Port of Mariel on May 14, 2021.  The recipient picked up the container on June 4, 2021 and returned it to the Container Terminal at the Port of Mariel on June 29, 2021.

111.    Since at least 2016 through at least July 2021, MSC purposefully and repeatedly carried cargo from various locations, including the United States, to the Port of Mariel and directed ships to call at the Container Terminal, which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel, where the ships, for themselves and on behalf of and/or at the direction of Defendant, called at the Container Terminal and while there engaged in commercially beneficial transactions and other commercial activities with the Container Terminal, AUSA, ZEDM and/or Mapor Habana including, but not limited to, offloading and loading containers of cargo carried by Defendant, thereby using or otherwise benefiting from the  Confiscated Property without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(ii). MSC's commercial activities with the Container Terminal, AUSA, ZEDM and/or Mapor Habana make MSC's container business at the Port of Mariel possible and profitable.

112.    Since at least 2016 through at least July 2021, Defendant knowingly and intentionally carried cargo from various locations, including the United States, to the Port of Mariel

and directed ships to call at the Port of Mariel to engage in commercially beneficial transactions and other commercial activities—including, but not limited to, calling at the Container Terminal, which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel, and offloading and loading containers of cargo carried by Defendant at the Container Terminal whereby MSC, caused, directed, participated in, or profited from trafficking by other persons such as or more of TCM, AUSA, ZEDM and Mapor Habana, or otherwise engaged in trafficking through one or more of TCM, AUSA, ZEDM and Mapor Habana without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

> **B. Defendant Also Traffics in the Confiscated Property by Operating Vessels that Call at the Port of Mariel Without Plaintiffs' Authorization and by Contracting with Third-Party Feeder Vessels that Call at the Port of Mariel Without Plaintiffs' Authorization**

113.    MSC has trafficked in the Confiscated Property by knowingly and intentionally directing container ships to call at the Container Terminal—which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel in Cuba—either directly or by causing, directing, participating in, or profiting from trafficking by or through one or more other persons.

114.    "Calling" at a port in the container shipping industry means that containers are either offloaded or loaded at a Port of Call. See https://www.marineinsight.com/life-at-sea/what-does-the-term-port-of-call-means/ (last visited September 15, 2021).  While calling at the Port of Mariel, the container ships dock and utilize wharf space, offload and/or load containers, hook up to water and electricity, utilize crane service, container storage yards, warehouses and other storage space to store the containers, as well as road, rail and wheeled means of conveyance for the containers it unloads.  The container ships contract for and pay for these and other services at the Port of Mariel with the TCM, AUSA, and/or the ZEDM.  Containers that MSC carries to the Port of Mariel on ships directed to the Port of Mariel by MSC are offloaded at the Container Terminal

in ZEDM Sector 7 and stored in the container storage yard operated by AUSA in ZEDM Sector A5. MSC also engages in commercial activities using or otherwise benefitting from the Plaintiffs' Confiscated Property and acts of trafficking by the Container Terminal, AUSA and the ZEDM which make MSC's container business at the Port of Mariel possible and profitable.

115. Container data on MSC's web tracking system reveals the names of the vessels that offloaded the containers in Mariel. For example, one such vessel, the MSC NADRIELY, is part of MSC's fleet. Between September 25, 2016 and July 16, 2017, the MSC NADRIELY called at the Port of Mariel fourteen times while being operated by MSC:

**MSC Nadriely Movements**

| Status and Distance | Port | Country | From | To | Destination |
|---|---|---|---|---|---|
| **called at** | Mariel | Cuba (GMT -04H) | 16/07/2017 05:38:00 GMT | 17/07/2017 16:24:00 GMT | Caucedo |
| **called at** | Mariel | Cuba (GMT -04H) | 05/06/2017 05:30:00 GMT | 07/06/2017 00:11:00 GMT | Cristobal |
| **called at** | Mariel | Cuba (GMT -04H) | 22/05/2017 19:17:00 GMT | 23/05/2017 19:12:00 GMT | Cristobal |
| **called at** | Mariel | Cuba (GMT -04H) | 30/04/2017 12:46:00 GMT | 01/05/2017 15:00:00 GMT | Puerto Barrios |
| **called at** | Mariel | Cuba (GMT -04H) | 16/04/2017 15:42:00 GMT | 17/04/2017 19:23:00 GMT | Cristobal |
| **called at** | Mariel | Cuba (GMT -04H) | 22/03/2017 03:17:00 GMT | 24/03/2017 01:23:00 GMT | Puerto Limon |
| **called at** | Mariel | Cuba (GMT -04H) | 09/03/2017 18:31:00 GMT | 11/03/2017 00:05:00 GMT | Cristobal |
| **called at** | Mariel | Cuba (GMT -04H) | 20/02/2017 22:52:00 GMT | 22/02/2017 16:02:00 GMT | Cristobal |
| **called at** | Mariel | Cuba (GMT -04H) | 06/02/2017 01:00:00 GMT | 07/02/2017 23:41:00 GMT | Cristobal |
| **called at** | Mariel | Cuba (GMT -04H) | 21/01/2017 02:43:00 GMT | 23/01/2017 01:12:00 GMT | Caucedo |
| **called at** | Mariel | Cuba (GMT -04H) | 06/12/2016 21:41:00 GMT | 09/12/2016 22:28:00 GMT | Cristobal |
| **called at** | Mariel | Cuba (GMT -04H) | 16/10/2016 22:08:00 GMT | 18/10/2016 07:35:00 GMT | Puerto Cortes |

| called at | Mariel | Cuba (GMT -04H) | 03/10/2016 18:17:00 GMT | 05/10/2016 12:29:00 GMT | Kingston(JAM) |
| called at | Mariel | Cuba (GMT -04H) | 25/09/2016 09:45:00 GMT | 27/09/2016 19:30:00 GMT | Cristobal |

116.   In addition, MSC contracts third-party feeder vessels to fulfil the final leg of the shipments they deliver to the Port of Mariel:

> "Melfi has mainline services. Maersk has a mainline service coming from North Europe that started in May. Hapag-Lloyd runs services from Mexico. The rest are bringing in cargo by feeders, from Panama and Kingston and the Bahamas and a little from Caucedo [in the Dominican Republic], much of it through Isla Bonita Shipping … [.]"[16]

117.   Two of the five vessels (currently known to Plaintiffs) that have carried MSC shipments to the Port of Mariel—the X-PRESS MACHU PICHCCU (seven shipments) and the Caribbean Express (two shipments)—are X-Press Feeders ships that departed from Panama.

118.   MSC purposefully and repeatedly directed vessels, or contracted with third-party feeder vessels, to call at the Port of Mariel where each of them, for themselves and on behalf of and/or at the direction of MSC, called at the Container Terminal and made use of AUSA's services including at the container storage yard, which are part of the Port of Mariel and located within the ZEDM and within the Bay of Mariel, and engaged in commercial transactions and other commercial activities—including, but not limited to, offloading and loading containers of cargo carried by MSC at the Container Terminal—thereby using or otherwise benefiting from the Confiscated Property without the authorization of Plaintiffs, which constitutes trafficking as

---

[16]https://webcache.googleusercontent.com/search?q=cache%3Ahttps%3A%2F%2Fwww.joc.com%2Fport-news%2Fterminal-operators%2Fpsa-international%2Fmariel-port-head-outlines-cuba-long-term-shipping-prospects_20160905.html&rlz=1C5CHFA_enUS779US779&oq=cache%3Ahttps%3A%2F%2Fwww.joc.com%2Fport-news%2Fterminal-operators%2Fpsa-international%2Fmariel-port-head-outlines-cuba-long-term-shipping-prospects_20160905.html&aqs=chrome..69i57j69i58.2790j0j4&sourceid=chrome&ie=UTF-8 (last visited Sept. 15, 2021).

defined in 22 U.S.C. § 6023(13)(A)(ii).  MSC's commercial activities with the Container Terminal, AUSA, ZEDM and/or Mapor Habana make MSC's container business at the Port of Mariel possible and profitable.

119.    While calling at the Port of Mariel, ships directed to the Port of Mariel by MSC (either directly or via third-party feeder vessels) knowingly and intentionally engaged in commercial transactions and other commercial activities—including, but not limited to, offloading and loading containers of cargo carried to the Port of Mariel by Defendant at the Container Terminal—whereby MSC for itself, caused, directed, participated in, or profited from trafficking by another person, or otherwise engaged in trafficking through another person without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

> **C.    Defendant Traffics in the Confiscated Property By and Through Defendant's Agent, Agencia Maritima Mapor S.A. ("Mapor Habana") in the Port of Mariel Without Plaintiffs' Authorization**

120.    Defendant's agent Mapor Habana provided (and continues to provide) logistics services as Defendant's "agents" at the Port of Mariel within the ZEDM and within the Bay of Mariel, where it for itself and on behalf of and/or at the direction of Defendant engages in commercially beneficial transactions and other commercial activities with the Container Terminal, AUSA, and/or the ZEDM including, but not limited to providing services as Defendant's agent, thereby using or otherwise benefiting from the Confiscated Property, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(ii).

121.    Defendant knowingly and intentionally directed its agent Mapor Habana to engage in commercially beneficial transactions and other commercial activities at the Port of Mariel— including, but not limited to, providing services as Defendant's agent at the Port of Mariel within the ZEDM and within the Bay of Mariel, whereby Defendant, caused, directed, participated in, or

profited from trafficking by another person, or otherwise engaged in trafficking through another person without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

122.     In addition, Defendant, by and through its agent Mapor Habana, profits from Mapor Habana's commercial, for profit business operations at the Port of Mariel including Mapor Habana's acting as Defendant's agent in Cuba, accepting customer bookings involving Cuba, issuing U.S. bills of lading for shipments to Cuba, and providing "inland forwarding services in addition to the voyage" (*see supra* ¶¶ 108 – 109) without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

123.     In sum, and as the facts demonstrate in Paragraphs 104 – 122, *supra*, Defendant traffics in the Confiscated Property because:

(a)     TCM, AUSA, and ZEDM all use an interest in the Confiscated Property pursuant to 22 U.S.C. § 6023(13)(A)(i);

(b)     TCM, AUSA, and/or ZEDM manage, distribute, dispense, broker, possess, have obtained control of or otherwise have acquired an interest in the Confiscated Property pursuant to 22 U.S.C. § 6023(13)(A)(i);

(c)     TCM leases or has otherwise acquired or holds an interest in the Confiscated Property pursuant to 22 U.S.C. § 6023(13)(A)(i);

(d)     Defendant engages in business activities using or otherwise benefitting from the Confiscated Property pursuant to 22 U.S.C. § 6023(13)(A)(ii);

(e)     Defendant engages in business activities with TCM, AUSA, ZEDM and Mapor Habana for the purpose of making money which they could not otherwise do if there were not ports, docks, and warehouses that had not been planned, studied, developed, built,

maintained, and available to be used and exploited in the Bay of Mariel pursuant to 22 U.S.C. § 6023(13)(A)(ii);

(f)      Defendant profits from trafficking by TCM, AUSA, ZEDM, and Mapor Habana as described in (a) through (e) of this paragraph pursuant to 22 U.S.C. § 6023(13)(A)(iii);

(g)      Defendant causes, directs and/or participates in trafficking by its agent, Mapor Habana, as described in (a) through (e) of this paragraph without the authorization of Plaintiffs pursuant to 22 U.S.C. § 6023(13)(A)(iii);

(h)      All of the above (a) through (g) are done without the authorization of Plaintiffs.

### V.   Plaintiffs Notified Defendant that Defendant is Trafficking in the Confiscated Property, the Claims to Which are Owned by Plaintiffs

124.    On June 3, 2021, Plaintiffs, through counsel, sent MSC a letter pursuant to 22 U.S.C. § 6082(a)(3)(D) ("Notice Letter") notifying MSC that it is trafficking in confiscated property as defined in the Helms-Burton Act, the claims to which are owned by Plaintiffs, without the authorization of Plaintiffs.

125.    Plaintiffs sent the Notice Letter by FedEx, International Priority, and separately, by the United States Postal Service ("USPS") International Registered Mail.

126.    FedEx delivered the Notice Letter to MSC on June 7, 2021.

127.    The USPS delivered the Notice Letter to MSC on July 2, 2021.

128.    On June 30, 2021 MSC's counsel sent Plaintiffs' counsel a letter acknowledging that MSC had been offering "services in relation to the alleged Confiscated Property" and alleged that MSC ceased providing such services "[u]pon receipt" of the Notice Letter:

Upon receipt of the Notices, MSC SA promptly instructed that all services offered in

relation to the alleged Confiscated Property (as defined in the Notices) must cease with immediate effect. Thus, to the extent any MSC entity has engaged in any alleged trafficking as defined under the Helms-Burton Act (which we strongly dispute), such trafficking even under the broadest possible meaning has terminated. If Claimants still intend to pursue their claims against MSC and to the extent Claimants have any viable uncertified claims (which they do not), MSC will not be liable to the Claimants for treble damages. See 22 U.S.C. § 6082(a)(2)(B).

Letter from R. Brodsky to D. Baron (Jun. 30, 2021) (Exhibit D, hereto).

129.    However, MSC has continued to traffic since it received the Notice Letter.

130.    According to MSC's website, MSC was the carrier for a container numbered MEDU1954670 that was unloaded in the Port of Mariel off of X-Press Feeder's CARIBBEAN EXPRESS on July 10, 2021.  Exhibit E, hereto.  The shipment originally left Jacksonville on the JSP AMIHAN on or around April 16, was unloaded in the Bahamas on May 5, traveled to Panama on the MSC DAMLA between May 30 and June 3, and was loaded onto the CARIBBEAN EXPRESS for shipment to the Port of Mariel on July 2.   The shipment arrived in the Port of Mariel on July 10, 2021.  The bill of lading for the shipment (MEDUU1162343) shows that it contains 711 cases of wine.  *Id.*

131.    MSC's website also shows that MSC was the carrier for a shipment (bill of lading MEDUU1703872, container number MEDU7146427) that left Long Beach, California on or around May 30 was scheduled to travel from Panama to Mariel on the CARIBBEAN EXPRESS on or around July 17.  Exhibit F, hereto.  The CARIBBEAN EXPRESS delivered the container to the Container Terminal at the Port of Mariel on July 25, 2021.  *Id*.

132.    Because MSC did not obtain the authorization of Plaintiffs with regard to these acts of trafficking, occurring both before and after receiving the Notice Letter, Plaintiffs were injured by MSC's acts of trafficking in the Confiscated Property to which Plaintiffs own claims and MSC is subject to treble damages.

133.     Plaintiffs have been injured by MSC's unauthorized acts of trafficking in the confiscated property to which Plaintiffs own claims because, *inter alia*:

(a)     MSC is profiting without obtaining consent from or paying adequate compensation to Plaintiffs;

(b)     Plaintiffs are not receiving the benefit of their interests in the Confiscated Property;

(c)     MSC is profiting without obtaining authorization or paying adequate compensation to Plaintiffs for authorization to traffic in the confiscated property;

(d)     MSC is profiting or otherwise benefiting from trafficking in the Confiscated Property by or through others without obtaining authorization from, or paying adequate compensation to, Plaintiffs;

(e)     MSC's trafficking in the Confiscated Property has undermined Plaintiffs' rights to compensation for the Confiscated Property;

(f)     MSC has profited from its use of the Confiscated Property at Plaintiffs' expense;

(g)     MSC  has denied Plaintiffs the ability to obtain economic rent that could have been negotiated for in exchange for their authorization to MSC to traffic in the Confiscated Property;

(h)     MSC has appropriated from Plaintiffs the leverage from the Helms-Burton Act that Plaintiffs would have had on the Cuban Government to negotiate compensation for their Confiscated Property;

(i)     MSC has injured Plaintiffs by trafficking in the Confiscated Property without Plaintiffs' authorization and without making any payment of compensation to Plaintiffs because in the Helms-Burton Act, Congress provided the rightful owners of confiscated property with the right to be compensated from defendants who have economically exploited the confiscated property;

(j)     Defendant has injured Plaintiffs by trafficking in the particularized Confiscated Property to which Plaintiffs own claims without seeking or obtaining Plaintiffs' authorization to traffic in that particularized Confiscated Property and as a result Defendant's failure to do so has resulted in concrete and particularized monetary harm and injury to Plaintiffs; and

(k)     The harms and injuries suffered by Plaintiffs as a result of Defendant's failure to obtain Plaintiffs' authorization to traffic in the Confiscated Property have a close relationship to traditionally recognized common-law actions for unjust enrichment, trespass, trespass to chattels, and conversion.

(l)     There is a direct causal link between Plaintiffs' injuries from the Cuban Government's confiscation of the Confiscated Property and Defendant's unjust enrichment, trespass, trespass to chattels, and/or conversion from Defendant's commercially beneficial use of the Confiscated Property without Plaintiffs' authorization.

(m)     MSC's trafficking in the Confiscated Property without Plaintiffs' authorization has caused a concrete injury to Plaintiffs that is traceable to

MSC and has a close relationship to harms traditionally recognized providing a basis for a lawsuit in American courts – such as unjust enrichment, trespass, trespass to chattels and conversion.

**CLAIM FOR DAMAGES**
**TITLE III OF THE HELMS-BURTON ACT**

134.    Plaintiffs incorporate by reference all of the foregoing Paragraphs as if fully set forth herein.

135.    This case is brought pursuant to Title III of the Helms-Burton Act, 22 U.S.C. § 6082.

136.    MSC did traffic, as the term "traffic" is defined in 22 U.S.C. § 6023(13)(A), in the Confiscated Property without authorization of Plaintiffs who own claims to the Confiscated Property.  Defendant is therefore liable to Plaintiffs under the Helms-Burton Act.

137.    MSC has trafficked in the Confiscated Property, by knowingly and intentionally carrying or directing containers to be carried to the Port of Mariel in Cuba where the containers are off-loaded, either directly or by causing, directing, participating in, or profiting from trafficking by or through another person.  Defendant uses, benefits, and profits from the Container Terminal in the ZEDM including the ZEDM's ports, docks, warehouses, and facilities.  Defendant also engages in commercial activities using or otherwise benefitting from the ZEDM and Plaintiffs' Confiscated Property.

138.    MSC also has trafficked in the Confiscated Property, by knowingly and intentionally directing container ships to call at the Port of Mariel in Cuba, either directly or by causing, directing, participating in, or profiting from trafficking by or through another person. When in the Port of Mariel, the container ships call at, and/or otherwise use, benefit, and profit from the Container Terminal in the ZEDM including the ZEDM's ports, docks, warehouses, and

facilities.  Defendant also engages in commercial activities using or otherwise benefitting from the ZEDM and Plaintiffs' Confiscated Property including, but not limited to, the 70-Year Concession, without the authorization of Plaintiffs.

139.    MSC is therefore trafficking in Plaintiffs' Confiscated Property and benefit or profit from the trafficking of the Container Terminal, AUSA, and the ZEDM in Plaintiffs' Confiscated Property including, but not limited to, the 70-Year Concession, without the authorization of Plaintiffs.

140.    MSC, as a result of carrying containers to the Port of Mariel and as a result of directing containers ships to the Port of Mariel also has trafficked in the Confiscated Property by knowingly and intentionally participating in, benefitting  from, and profiting from the commercial activities of the Container Terminal, AUSA, ZEDM and/or Mapor Habana's trafficking in the Confiscated Property including, but not limited to, the 70-Year Concession, without the authorization of Plaintiffs.

141.    MSC engages in a commercial activity using or otherwise benefitting from the Confiscated Property, including, but not limited to, the 70-Year Concession.

142.    MSC also causes, directs, participates in, or profits from trafficking by the Container Terminal, AUSA, and the ZEDM in the Confiscated Property, including the 70-Year Concession.

143.    MSC has had actual knowledge of Plaintiffs' claims to the Confiscated Property since at least June 7, 2021, due to Plaintiffs' Notice Letter mentioned above in Paragraphs 124 - 127.

144.    Prior to MSC's receipt of Plaintiffs' Notice Letters, MSC knew or had reason to know that Plaintiffs own claims to the Confiscated Property.

145.    Prior to MSC's receipt of Plaintiffs' Notice Letters, MSC knew or had reason to know that the ZEDM was trafficking in the Confiscated Property.

146.    MSC's continued trafficking in the Confiscated Property, including in the 70-Year Concession, more than 30 days after its receipt of Plaintiffs' Notice Letters subjects MSC to treble damages.  22 U.S.C. § 6082(a)(3).

147.    The Container Terminal, AUSA, and the ZEDM did not ever seek or obtain Plaintiffs' authorization to traffic in the Confiscated Property, including the 70-Year Concession, the land, or any other Confiscated Property at any time.

148.    The Container Terminal, AUSA, and the ZEDM's knowing and intentional conduct with regard to the Confiscated Property constitutes trafficking as defined 22 U.S.C. § 6023(13).

149.    MSC did not seek nor obtain Plaintiffs' authorization to traffic in the Confiscated Property, including in the 70-Year Concession or any other property interests at any time.

150.    MSC's knowing and intentional conduct with regard to the Confiscated Property constitutes trafficking as defined in 22 U.S.C. § 6023(13).

151.    As a result of MSC's trafficking in the Confiscated Property, MSC is liable to Plaintiffs for all money damages allowable under 22 U.S.C. § 6082(a) including, but not limited to, those equal to:

a.      The amount which is the greater of: … (i) the amount determined by a special master pursuant to 22 U.S.C. § 6083(a)(2); or (ii) the current "fair market value" of the Confiscated Property, or the original fair market value of the Confiscated Property plus pre-filing interest;

b.      Three times the amount determined above (treble damages);

c.      Prejudgment interest; and

d.      Court costs and reasonable attorneys' fees, and expenses.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against MSC as follows:

A.      Awarding damages as allowed by law including treble damages and pre-filing interest as provided by the Act;

B.      Awarding prejudgment interest as allowed by law on any amounts awarded;

C.      Awarding attorneys' fees, costs, and expenses; and

D.      Awarding such other and further relief as may be just and proper.

**JURY DEMAND**

Plaintiffs demand a jury trial on all issues so triable, and a trial pursuant to Rule 39(c), Federal Rules of Civil Procedure, as to all matters not triable as of right by a jury.

Dated:  September 22, 2021                    Respectfully submitted,

s/ *David J. Horr*
David J. Horr
Florida Bar. No. 310761
dhorr@admiral-law.com
William R. Boeringer
Florida Bar No. 347191
wboeringer@admiral-law.com
William B. Milliken
Florida Bar No. 143193
wmilliken@admiral-law.com
Horr, Novak & Skipp, P.A.
Two Datran Center, Suite 1700
9130 S. Dadeland Boulevard
Miami, Florida 33156
Telephone: (305) 670-2525
Facsimile: (305) 670-2526

John S. Gaebe
Florida Bar No. 304824
Law Offices of John S. Gaebe P.A.
5870 SW 96 St.
Miami, Florida  33156
johngaebe@gaebelaw.com

*Counsel for Plaintiffs*

*Of Counsel*

David A. Baron (*pro hac vice* motion forthcoming)
dbaron@bcr-dc.com
Melvin White (*pro hac vice* motion forthcoming)
mwhite@bcr-dc.com
Dale Eppler (*pro hac vice* motion forthcoming)
deppler@bcr-dc.com
Laina C. Lopez (*pro hac vice* motion forthcoming)
lcl@bcr-dc.com
Berliner Corcoran & Rowe LLP
1101 17th Street, N.W., Suite 1100
Washington, D.C. 20036-4798
Tel:  (202) 293-5555
Facsimile:  (202) 293-9035

Richard W. Fields (*pro hac vice* motion forthcoming)
fields@fieldslawpllc.com
Martin Cunniff (*pro hac vice* motion forthcoming)
MartinCunniff@fieldslawpllc.com
Edward Han (*pro hac vice* motion forthcoming)
edhan@fieldslawpllc.com
Fields PLLC
1701 Pennsylvania Ave, N.W., Suite 200
Washington, D.C. 20006
Tel:  (833) 382-9816